UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

FRANCISCO ROSADO,                                    Case No.:  **1:18-cv-9760**

                            Plaintiff,               **COMPLAINT**

            -against-                                **JURY DEMAND**

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT ("NYPD") CHIEF OF
INTELLIGENCE BUREAU THOMAS GALATI,
NYPD COMMANDING OFFICER HOWARD
REDMOND, AND NYPD LIEUTENANT KARL
PFEFFER,

                            Defendants.

------------------------------------------------------------X

         Plaintiff, Francisco Rosado   ("Plaintiff"), by and through his attorneys, Ballon Stoll

Bader & Nadler, P.C., complaining of Defendants, The City of New York, New York City Police

Department ("NYPD") Chief of Intelligence Bureau Thomas Galati ("Defendant Galati" or

"Chief of Intelligence Bureau Galati"), NYPD Commanding Officer Inspector Howard Redmond

("Defendant Redmond" or "CO Redmond"), and NYPD Executive Officer/Lieutenant Karl

Pfeffer ("Defendant Pfeffer" or "Lieutenant Pfeffer") (collectively, "Defendants"), alleges upon

personal knowledge, unless where information and belief is stated, the following:

         1.      This action seeks to vindicate the rights of the Plaintiff in the NYPD's Executive

Protection Unit ("EPU" or "the Unit"), a unit of the NYPD's Intelligence Bureau, whose

promotions were denied and delayed based on his age and national origin.

         2.      This is an action brought for substantial compensatory damages and reasonable

counsel fees premised upon the Defendants' acts of unlawful discrimination, based on Plaintiff's

age and national origin, for his marginalization and the resultant diminution of promotional

1

opportunities, and the unlawful denial to Plaintiff of promotion and benefits to which he is entitled for a substantial period of time, unlawful employment discrimination, and an unlawful hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000 *et seq.* ("Title VII"); the Executive Law of the State of New York, New York State Human Rights Law ("Executive Law"), § 296 et seq; and the Administrative code of the City of New York, New York City Human Rights Law ("Administrative Code") § 8-101, et seq.

## JURISDICTION AND VENUE

3.     This court has jurisdiction over Plaintiffs' federal claim pursuant to 28 U.S.C. §1331 and 42 U.S.C. §§ 2000-e5(f)(1),5(f)(3) and supplemental jurisdiction over the State and City law claims pursuant to 28 U.S.C. § 1367.

4.     As the Southern District is the district where a substantial part of the events giving rise to the claims occurred, venue is proper within this district pursuant to 28 U.S.C. § 1391 (a)(2).

5.     Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") against Defendants on April 13, 2018 complaining of discrimination on the basis of national origin as alleged in this complaint. The charge expressly alleged that the discrimination emanated from a policy and practice Defendants employed of not promoting lieutenants of Plaintiff's national origin and requested the EEOC investigate the matter "as a systemic pattern and practice case."

6.     On July 27, 2018, the EEOC issued a right to sue letter under Title VII against the Defendants. (attached hereto as **Exhibit 1**)

## THE PARTIES

*Plaintiff*

7.      Plaintiff is a fifty-one (51) year old male whose date of birth is August 5, 1967.

8.      Plaintiff is originally from Puerto Rico and of Hispanic descent.

9.      Plaintiff is a "person" within the meaning of Executive Law § 292(1), and within the meaning of New York City Administrative Code § 8-102(1).

10.     Plaintiff resides in Bronx, New York.

*Defendants*

11.     Defendant The City of New York (the "City") is a municipal corporation existing by virtue of the laws of the State of New York.  The City, through the NYPD, maintains a de facto policy and practice of discrimination based upon age and national origin.  The City is liable for the discrimination Plaintiff suffered.

12.     Defendant City, is an employer within the meaning of Executive Law § 292(5), and within the meaning of Administrative Code § 8-107(5).  Upon information and belief, the NYPD employs approximately 40,000 police officers throughout the City of New York.

13.     At all relevant times herein, Plaintiff was employed by the Defendant City in its NYPD.

14.     Defendant Galati is employed by the City's NYPD as Chief of Intelligence Bureau, whose command includes but is not limited to the Municipal Security Section, Executive Protection Unit ("EPU") of the City's NYPD's Intelligence Bureau.

15.     Upon information and belief, Defendant Galati has supervisory authority over the personnel in the EPU; and, upon further information and belief, he is a key decision-maker as to

3

personnel and staffing matters, including but not limited to recommending and approving NYPD discretionary promotions within the ranks of Detectives, Sergeants, Lieutenants and Captains.

16.    Defendant Redmond is employed by the City's NYPD as the Commanding Officer ("CO") of the Municipal Security Section, EPU of the NYPD's Intelligence Bureau.

17.    Defendant Redmond is responsible for daily operation of the EPU; and, upon information and belief is a decision-maker as to personnel and staffing matters, including but not limited to recommending and approving NYPD promotions under his command.

18.    Defendant Pfeffer is employed by the City's NYPD as a Lieutenant assigned to the EPU as an Executive Officer.

### JURY DEMAND

19.    Plaintiff hereby demands a trial by jury in this action.

### FACTS

***General Background on NYPD Ranks***

20.    The lowest uniform rank within the NYPD is police officer.

21.    Any police officer who conducts investigative work for eighteen (18) months must be promoted to Detective.

22.    Above the rank of Detective are the supervisory ranks, starting with Sergeant, then Lieutenant, Captain, Deputy Inspector, Inspector, Chief, up to the Commissioner.

23.    Newly promoted supervisory officers begin at the lowest rank – Sergeant. Sergeants are eligible for promotion to Lieutenant, and then Captain. Sergeants and Lieutenants are also eligible for discretionary promotions. A Lieutenant may be promoted to Lieutenant Commander (LCD) or Lieutenant Special Assignment (LSA) at the recommendation of his

Commanding Officer. Both titles are equal in rank and benefits. However, they may differ in assignment responsibilities.

24.    Lieutenants, who are promoted to Lieutenant Commander (LCD) or Lieutenant Special Assignment (LSA), receive a coveted title promotion, added supervisory responsibilities, and a substantial increase in monetary compensation.

25.    There is a tremendous difference in monetary compensation and prestige between a Lieutenant and a Lieutenant Commander (LCD).    Lieutenant Commanders have base compensation levels approximately $13,000.00 per year above Lieutenants and are eligible for an increased compensation premium in their overtime, cash payments for unused vacation and compensation time, and retirement pensions.

26.    Upon information and belief, the difference in retirement pension money between a Lieutenant and a Lieutenant Commander is approximately $13,000 per year, for the life of that Lieutenant.

27.    Lieutenant Commanders designations also benefit from advantages in professional networking and can earn significantly more in private practice upon retirement from the NYPD than lower-ranked supervisory officers.

28.    Promotions within Lieutenant grades are recognized as major accomplishments, with announcements submitted to all commands within the NYPD.    Each promotion is recognized with a formal ceremony at NYPD headquarters, where the Lieutenant appears in full dress uniform in the presence of family and friends and personally receives the promotion from the NYPD Commissioner.

*Discrimination in the EPU of the NYPD's Intelligence Bureau*

29.    Upon information and belief, based on Plaintiff's workplace experiences, the Defendants are culpable for promoting and condoning a pattern of systemic discriminatory practice affecting certain protected classes of persons; and, upon further information and belief, the Defendants are culpable for promoting and condoning a pattern of systemic discriminatory practice based upon the age and national origin of the Plaintiff; and Plaintiff falls within the age and national origin protected classes.

30.    Although Plaintiff's claims of discrimination against Defendants are based upon his age (51) and national origin (Puerto Rican), upon information and belief, examples of the breadth of Defendants' systemic pattern of discriminatory practices as to other protected classes of EPU detectives are reflected by discrimination complaints recently filed with the EEOC by the following NYPD EPU detectives: Detective Keith Dietrich (age); Detective Abdelim Azab (religion and national origin); Detective Erin Fitchett (race); and  Detective Karl Rugg (age) — all of whom have recently received Notices of the Right to Sue (in federal court) issued by the EEOC.  Detective Abdelim Azab has recently filed a lawsuit in this Court (18-cv-7004). Detective Keith Dietrich has also recently filed a lawsuit in this court (18-cv-07544).   In addition, EPU Detective Alex Pelepelin has filed an age and national origin discrimination lawsuit in New York State Supreme Court, New York County (Index No. 154246/2018).

31.    Upon information and belief, Mayor Bill de Blasio has been regularly apprised of, and is aware of the EEOC complaints, Notices of the Right to Sue (in federal court) issued by the EEOC, and discrimination lawsuits brought by certain detectives in the EPU (as well as a class action suit brought by detectives in NYPD's Intelligence Bureau), and particularly, the lawsuits

brought by Detectives Alex Pelepelin, Abdelim Azab, Keith Dietrich and Erin Fitchett (referred to in the preceding paragraph).

32.    Nevertheless, upon information and belief, Mayor de Blasio has not publically addressed with specificity:  the above-mentioned EEOC discrimination complaints (including but not limited to Plaintiff's); Notices of Right to Sue issued by the EEOC to five (5) EPU detectives and one (1) EPU lieutenant (Plaintiff herein); or the four (4) discrimination lawsuits filed by four (4) EPU Detectives.

33.    Upon further information and belief, the Mayor of the City of New York has not spoken out against preferential assignments or preferential promotions that result in discriminatory practices, as alleged herein; nor, upon information and belief, has the Mayor ordered an investigation of such alleged discriminatory practices.

34.    Plaintiff has been employed by the City's NYPD since August 1993 when he was accepted into the Police Academy.

35.    In April 2000, Plaintiff became a Sergeant.

36.    In June 2006, Plaintiff was promoted to the rank of Lieutenant.

37.    Plaintiff received no promotions from 2006 to May 2018, despite an exemplary performance record, and despite the fact that other, less qualified lieutenants who were younger and not Hispanics had been promoted.

38.    In September 2013, Plaintiff was selected to join the Mayor's Detail and assigned to the Executive Protection Unit, where he served as a Supervising Officer. The purpose of this unit is to protect the Mayor and his family.

39.    In May 2018, approximately a month after he filed his EEOC complaint alleging discrimination on the basis of national origin, Plaintiff was finally promoted to the rank of

Lieutenant Commander (LCD). However, this promotion was given only after an inordinate twelve-year period of non-promotion, and the filing of an EEOC complaint alleging national origin discrimination; and, upon information and belief, only after increased legal pressure was put on the EPU and CO Redmond for administering, fostering and condoning a discriminatory promotion process. Furthermore, upon information and belief, such belated promotion constituted a tacit admission of the viability of Plaintiff's claim of longstanding discrimination on the basis of his national origin and age.

40.    Upon information and belief, the Defendants herein, on a continuous basis, effectively demoted and or marginalized Plaintiff without cause or any non-discriminatory purpose. Such baseless and demeaning actions reflect the continuous animus and discrimination that Defendants directed toward Plaintiff because of his age and national origin.

41.    Such marginalization of Plaintiff, on the basis of his national origin and age had a negative impact upon Plaintiff's promotional opportunities.

42.    Upon information and belief, the only other Lieutenant in the EPU, who was approximately four (4) years younger than Plaintiff, and not of Plaintiff's national origin (not Puerto Rican or Hispanic) and who was not in the protected categories of the EPU Detective EEOC Complainants, was not subjected to discriminatory treatment or practices on a continuing and ongoing basis.

43.    An example of the continuous discriminatory treatment directed at Plaintiff by Defendants, occurred on or about January 17, 2014, when CO Redmond (who is white and not Puerto Rican or Hispanic) inexplicably replaced Plaintiff by appointing Lieutenant Karl Pfeffer (who was four (4) years younger than Plaintiff, white and not Puerto Rican or Hispanic) from Patrol Precinct to Supervisor of EPU. Lieutenant Pfeffer had only been with the EPU for a mere

sixteen days before CO Redmond chose him to replace Plaintiff as EPU Supervisor. Despite Plaintiff's significant advantage over Lieutenant Pfeffer in years of executive protection experience and time in the EPU, CO Redmond arranged for Lieutenant Pfeffer to replace Plaintiff as EPU Supervisor, and consequently, for Plaintiff to be stripped of the financial, promotional, and networking benefits that Lieutenant Pfeffer would receive as EPU Supervisor.

44.     Further, after effectively demoting and replacing Plaintiff with a less experienced officer (who was younger and not Puerto Rican or Hispanic), CO Redmond continued to humiliate Plaintiff by requesting that Plaintiff train Lieutenant Pfeffer to replace Plaintiff as an EPU Supervisor for approximately three (3) weeks, which, upon information and belief, created the perception at Plaintiff's workplace, that Plaintiff had been effectively demoted.

45.     Another example of the discriminatory and harassing treatment continuously directed at Plaintiff by Defendants on an ongoing basis, occurred throughout virtually all of Plaintiff's time serving as Gracie Mansion Security Coordinator.  During this period, CO Redmond would frequently send Sergeants who were younger than Plaintiff, and were non-Hispanics, to Gracie Mansion to supervise Officers already under Plaintiff's supervision.  Given Plaintiff's considerable experience acting in supervisory roles, upon information and belief, CO Redmond's decision to use manpower in such a duplicative manner could have only been motivated by his animus against Plaintiff, because of Plaintiff's age and national origin.

46.     In a similar vein, throughout Plaintiff's time serving under CO Redmond, CO Redmond frequently promoted officers under Plaintiff's direct supervision, without consulting or at all seeking advice, input, or guidance from Plaintiff.  At the same time, CO Redmond did seek the advice of similarly ranked supervisory officers, who were younger than Plaintiff and non-Hispanics, when he sought to promote someone under those officers' direct supervision.

47.     Plaintiff was also discriminated against because of his age and national origin when he was passed over and excluded from specialty training with Federal counterparts, such as the Federal Marshalls and Secret Service, while offers to participate in such training were extended to other NYPD Officers of equal rank and grade who were younger than Plaintiff and non-Hispanics.  In fact, Detectives and other ranking Officers within the EPU who were younger than Plaintiff and non-Puerto Rican and non-Hispanics, were offered the opportunity to get such specialty training, while Plaintiff was never offered this opportunity.

48.     Furthermore, the examples articulated in paragraphs 43-47, herein, are also examples of the continuous marginalization of Plaintiff by Defendants during his entire tenure at the NYPD's EPU.  Such marginalization had a negative impact upon Plaintiff's promotional opportunities; i.e., the opportunities to be promoted from Lieutenant to Lieutenant Detective Commander for at least twelve (12) years.

49.     A prime example of Defendants' continuous attempts to marginalize Plaintiff occurred whenever EPU supervisory coverage of the Mayor was occasionally short-staffed.  At such times, Plaintiff offered to fill in and take care of the shortage.  Instead of accepting Plaintiff's offer, CO Redmond expressed his unmistakable intent to keep Plaintiff away from the Mayor, by going out of his way to repeatedly reject Plaintiff's offers and instead brought in other officers, some of whom required overtime compensation, even though Plaintiff was available at regular pay.  Upon information and belief, this decision exhibits a conscious effort, on the part of CO Redmond, to prevent Plaintiff from receiving the experience and assignments necessary to be promoted to Lieutenant Commander.

***The Intelligence Bureau's Discriminatory, Secret and Unstructured Promotion Process***

50.     The NYPD professes that promotions are the result of merit alone.

10

51.    Yet, CO Redmond has not provided a single written evaluation or review of Plaintiff over the four years Plaintiff has been assigned to the EPU and has been reporting to CO Redmond.

52.    The NYPD has no structured policy or procedure governing the promotions process for Lieutenants.  The only written policy the NYPD has for promotions, applies to how supervising officers evaluate the detectives they are supervising.  However, regarding the promotion of Supervisory Officers, the process is purely discretionary.  Only "Section Heads," such as CO Redmond, are permitted to promote a supervising officer. There are no guidelines for such promotions.  That responsibility rests with Defendant Galati.

53.    The responsibility for making decisions as to promotions, also rests with Deputy Director Miller.

54.    The NYPD does not publish when promotion decisions for Intelligence Bureau Lieutenants will be made, or who will participate in the decision-making process.

55.    Candidates for promotion are not told how many vacancies there are, who else they are competing against, or what criteria will be used to decide promotions.  Often, they are not even informed that they are being considered for promotion.

56.    In practice, upon information of belief, promotions are the result of a highly subjective decision-making process, with decisions about advancement made in secret by non-Hispanic, high-level Supervisory Officers.

57.    Upon information and belief, age and national origin played an impermissible role in all levels of the highly subjective promotions process.  From the beginning to end, the process of being transferred into the Intelligence Bureau—and succeeding within it—is opaque and works against employees who are of Plaintiff's age and who are Puerto Rican and Hispanic.

58.     In fact, during the past fifteen (15) years, only one Lieutenant (Plaintiff) out of three (3) Hispanic Lieutenants assigned to the Municipal Security Section, EPU, has been promoted while in the Unit; and, as discussed, *supra*, only after Plaintiff filed his EEOC national origin discrimination complaint, and after he received the Notice of Right to Sue.

59.     Throughout his lengthy career, until Defendant Redmond was designated CO of the EPU, Plaintiff was regularly assigned posts that included increasingly greater responsibilities. These assignments functioned, essentially, as merit-based, *de facto* "promotions," or promotional opportunities for Plaintiff.

60.     In April 2000, Plaintiff was assigned to the 47th Precinct in Bronx County, where he was appointed Patrol Supervisor, Conditions Supervisor, and Supervisor of Community Policing. Serving in this role, Plaintiff was responsible for supervising approximately ten uniform Officers.

61.     In Fall 2003, Plaintiff was assigned to the Narcotics Division, where supervised a team of eight to ten Detectives in narcotics investigations.

62.     In June 2006, Plaintiff was promoted to the rank of Lieutenant.

63.     In June 2006, Plaintiff was assigned to the 50th Precinct in Bronx County, where he served as Special Operations Coordinator. Plaintiff supervised approximately twenty-five (25) uniform Officers.

64.     On or about June 27, 2008, Plaintiff was assigned to the Intelligence Division, where he served as Intel Operations Desk Supervisor. In this role, Plaintiff supervised four (4) sergeants and approximately twenty (20) Detectives or Police Officers.

65.     In June 2009, Plaintiff was assigned to the Intel Surveillance Unit, where he supervised three Sergeants and approximately twenty Detectives.

66.     As Supervisor in the Intel Surveillance Unit, Plaintiff oversaw surveillance, in a joint effort with the Joint Terrorist Task Force, that lead to the critical September 2009 capture and arrest of Najibulla Zazi, who had plotted to bomb the New York City subway system. While working on the Zazi case, Plaintiff supervised approximately sixty (60) Detectives.

67.     In August 2010, Plaintiff was assigned the role of Field Intelligence Officer Coordinator. In this role, Plaintiff supervised approximately eighteen Sergeants in the Bronx and Manhattan North precincts.

68.     In September 2013, when Plaintiff was assigned to the Executive Protection Unit, where he served as Supervisor, he supervised eighteen Detectives and Officers.

69.     After being assigned to the EPU, until Inspector Redmond was promoted to Commanding Officer of EPU Detail, Plaintiff continued to be assigned reasonably advanced positions, with appropriately sizeable responsibilities, and commensurate compensation (although he still had not been promoted).

70.     As Supervisor in the EPU, Plaintiff was responsible for protecting two 2014 mayoral candidates: Bill de Blasio and Joe Lhota.

71.     During the 2013 election cycle, Plaintiff had no Sergeant to assist in supervising his assigned Detectives and Officers, which forced Plaintiff to carry a workload typically carried by two men. Plaintiff capably handled this additional responsibility.

72.     In November 2013, after the election, Plaintiff continued to protect Bill de Blasio, who had become the Mayor-elect, and began protecting Mayor-elect de Blasio's wife. During this post-election period, Plaintiff supervised one Sergeant and approximately fifteen (15) Detectives and Officers.

73.    In November 2013, Plaintiff attended and supervised a trip to Puerto Rico with Mayor de Blasio and his wife to attend a SOMOS conference.

74.    In December 2013, Plaintiff inherited additional responsibilities to include EPU Family Protection Detail, where his scope of protection expanded to include Mayor de Blasio's children. In this role, Plaintiff supervised three Sergeants and approximately twenty-one (21) Detectives and Officers.

75.    Although Plaintiff appeared to be in prime position for a promotion to the rank of Lieutenant Commander, the pattern of Plaintiff being assigned increasingly greater responsibilities changed drastically when Inspector Howard Redmond was assigned Commanding Officer of EPU Detail.

76.    On or about January 1, 2014, Captain Howard Redmond was assigned the role of Commanding Officer of EPU Detail.

77.    Instead of beginning to evaluate whether Plaintiff deserved a promotion, CO Redmond spurned any merit-based evaluation process and began a continuous practice of discrimination and marginalization of Plaintiff solely based on Plaintiff's age and national origin.

78.    On or about January 24, 2014, Plaintiff travelled with Mayor de Blasio to Washington D.C. for a conference. Upon information and belief, CO Redmond had never protected the Mayor on such trips. As such, Plaintiff was needed for his experience.

79.    After the January 2014 trip to D.C., CO Redmond never again selected Plaintiff for units travelling to protect the Mayor. Upon information and belief, CO Redmond had no non-discriminatory reason to remove a Lieutenant with Plaintiff's experience from the Mayor's travelling security detail, a detail that was highly visible and created enhanced promotional opportunities for those selected for that detail (and other details that protected the Mayor).

80.     In February 2014, Plaintiff was assigned Gracie Mansion Security Coordinator, a role within the EPU. In this capacity, Plaintiff supervised twenty-one uniform Officers. This was a step up for Plaintiff, but CO Redmond did not allow Plaintiff to retain this post for long.

81.     On or about October 27, 2014, CO Redmond replaced Plaintiff with Sergeant Tracey Gittens as Gracie Mansion Security Coordinator. Sergeant Gittens was approximately eight (8) years younger than Plaintiff, a non-Puerto Rican and non-Hispanic, and an officer who had far less executive protection experience than Plaintiff. In fact, Sergeant Gittens had been promoted to the rank of Sergeant only six months earlier, in June 2014. Sergeant Gittens was one of the officers that had directly reported to Plaintiff when she was assigned to EPU security detail. Despite Plaintiff's significant advantage over Sergeant Gittens in years of executive protection experience and time in the EPU, CO Redmond arranged for Sergeant Gittens to supplant Plaintiff as Gracie Mansion Security Coordinator, and consequently, for Plaintiff to be stripped of the financial, promotional, and networking benefits that Sergeant Gittens would receive as Gracie Mansion Security Coordinator. Such a demotion was wholly inappropriate, given Plaintiff's rank and years of exemplary service, and undoubtedly hurt Plaintiff's promotional opportunities; i.e., the opportunities to be promoted from Lieutenant to Lieutenant Commander.

82.     In October 2014, CO Redmond again effectively demoted Plaintiff by re-assigning him to replace a Sergeant (Sgt. Valentin-Vega) as Supervisor of the EPU Family Protection Detail/Unit. After years of exemplary service and holding honorably and effectively the rank of Lieutenant, Plaintiff was intentionally assigned to a post held by a Sergeant.

83.     On or about January 30, 2015, Lieutenant Pfeffer, the officer who CO Redmond had originally chosen to replace Plaintiff as EPU Supervisor, was promoted to Lieutenant

Commander of the EPU. This promotion is completely discretionary, and can only be prompted by CO Redmond. Lieutenant Pfeffer was still four (4) years younger than Plaintiff, white and not Hispanic or of Puerto Rican origin. Despite Plaintiff's significant advantage over Lieutenant Pfeffer in years of executive protection experience and time in the EPU, CO Redmond effectively arranged for Lieutenant Pfeffer to replace Plaintiff as EPU Supervisor, and for Lieutenant Pfeffer to use the position as a springboard for promotion to Lieutenant Commander. Thus, CO Redmond thus did more than strip Plaintiff of the financial, promotional, and networking benefits of serving as EPU Supervisor by replacing Plaintiff with Lieutenant Pfeffer. CO Redmond prevented Plaintiff from having the well-deserved and hard-earned opportunity to be timely promoted to Lieutenant Commander for no cause or reason other than age or national origin. Such a demotion was wholly inappropriate, given Plaintiff's rank and years of exemplary service, and had no basis other than discrimination because of age and national origin.

84. Even after being passed over for promotion, from October 2014 to February 2017, Plaintiff continued to serve in a distinguished capacity as Supervisor, Family Protection Detail/Unit.

85. In February 2017, Plaintiff was given an additional role, his old post of Gracie Mansion Security Coordinator. Upon information and belief, Sergeant Gittens had been suspended and re-assigned.

86. From February 2017 to May 2018, Plaintiff continued to serve in dual roles, both as Gracie Mansion Security Coordinator and Supervisor of the Family Protection Unit.

87. In January 2018, Plaintiff sent an email to the Chief of Intelligence Bureau, Thomas Galati, recounting his exemplary service with the NYPD and his glaring lack of promotion to Lieutenant Commander since CO Redmond arrived at the EPU. In this email,

Plaintiff stated that the only feasible explanation for being passed over for promotion was Plaintiff's Hispanic ethnicity and Puerto Rican national origin.

88.    Chief Galati responded that only Section Heads (i.e., CO Redmond) could recommend officers for promotion, and that he did not know why CO Redmond had never recommended Plaintiff for promotion.

89.    Upon information and belief, there are two Lieutenants in the EPU, and only one of those Lieutenants--Lieutenant Pfeffer--was promoted within a reasonable time frame.

90.    From 2006 to May 2018, Plaintiff did not receive any promotion to Lieutenant Commander, although the one other EPU Lieutenant, Lt. Pfeffer, who was  four (4) years younger and not Hispanic or of Puerto Rican national origin, was promoted from Lieutenant to Lieutenant Commander.

91.    Upon information and belief, Plaintiff has twenty-five (25) years of service in the NYPD and twelve (12) years in rank. Although Lieutenant Pfeffer had approximately the same number of years in rank as Plaintiff, he spent six (6) fewer years in the Intelligence Bureau than Plaintiff, and had far less experience in high-profile executive protection than Plaintiff.  Since Plaintiff is far more qualified than Lieutenant Pfeffer he should have been promoted long before Pfeffer.

92.    In addition to Plaintiff having quantitatively more executive protection experience than Lieutenant Pfeffer, Plaintiff had performed his job at qualitatively higher levels as well. Throughout his NYPD career, Plaintiff provided executive protection for high-profile officials such as for the President of the United States and the United Nations General Assembly, while Lieutenant Pfeffer had no such significant experience.

93.    Defendants' failure to promote Plaintiff from Lieutenant, which promotion was made in 2006, to Lieutenant Commander, while promoting another younger, non-Puerto Rican or Hispanic Lieutenant to Lieutenant Commander reveals the fact that in practice, promotions are the result of highly subjective decision-making process, with advancement made in secret by high level supervisors who favor younger, non-Puerto Rican or non-Hispanic Lieutenants.

94.    Plaintiff is aware that supervisor evaluations are directly connected to promotion decisions.  All Lieutenants in the Intelligence Bureau should receive written evaluations from their direct supervisors at least once per year.  In the evaluation, supervisors rank Lieutenants on various criteria on a scale of 0-5 and assess each Lieutenant's overall score of 0-5.  Supervisors, including but not limited to Defendant Redmond, also include written comments in the evaluations, including whether they recommend a candidate for promotion.

95.    Plaintiff has exhibited exemplary service during his tenure at the NYPD.

96.    Throughout his service to the NYPD, Plaintiff has consistently received performance ratings of 4.5 out of 5.0.

97.    CO Redmond was responsible for completing Plaintiff's annual, written performance evaluations.

98.    Yet, CO Redmond has not provided a single written evaluation or review of Plaintiff over the four (4) years Plaintiff has been assigned to the EPU and has been reporting to CO Redmond.

99.    The next-level promotion for Plaintiff, from Lieutenant to Lieutenant Commander, carries with it a salary increase of approximately $13,000 per year without overtime, and up to $20,000, including overtime.

100.    Furthermore, such salary increases entitle Plaintiff to enhanced retirement benefits.

101.    Supervisory Officers in the NYPD are paid using a four-step payment scale within each rank. With each successive year of a four-year period, an officer will receive an increase in annual salary.

102.    Officer's pensions match either their highest annual salary or an average of their salaries in their three (3) highest earning years.

103.    Plaintiff eventually received a promotion from Lieutenant to Lieutenant Commander in May 2018, but only after an inordinately lengthy, twelve-year period of non-promotion, and only after Plaintiff filed an EEOC complaint, alleging national origin discrimination, and upon information and belief, increased legal pressure was put on Defendants especially Defendant Redmond, for administering a discriminatory promotion process.

104.    Upon information and belief, Defendants' delaying of Plaintiff's promotion for discriminatory reasons based on age and national origin, feasibly cost Plaintiff a $12,000 reduction in his annual pension.

105.    Plaintiff has considered retiring over the next one-two (1-2) years. As such, if Plaintiff retires before reaching four years in rank, he will have been denied the opportunity to reach the highest "step" in the Lieutenant Commander scale, significantly lowering his pension benefits as a result.

106.    Upon information and belief, Defendants Galati and Redmond were important decision-makers and instrumental in denying Plaintiff a promotion for more than twelve (12) years, five of which Plaintiff has served in NYPD's EPU.

### FIRST CAUSE OF ACTION
**(National Origin Discrimination – Federal Claim Pursuant
to Title VII Against All Defendants)**

107.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-106 as set forth above.

108.    Defendants are employers as defined in Title VII, and at all relevant times herein, employed Plaintiff.

109.    In violation of 42 U.S.C. § 2000-e2(a), defendants discriminated against Plaintiff based on national origin by denying him promotions and promotional opportunities, and therefore giving him less pay and rank as compared to less qualified Lieutenants.

110.    This discrimination was a result of intentional actions by Defendants, deliberate indifference by Defendants, and /or the result of Defendants maintaining a policy or practice that treats Lieutenants of Plaintiff's national origin differently from and less favorably than similarly situated employees who are of different national origin, subjecting these individuals to disparate terms and conditions that similarly situated, less qualified non-Puerto Rican detectives do not endure, and has a disparate impact on Plaintiff.

111.    As a result of the Defendants' discriminatory conduct, Plaintiff has incurred and will continue to incur damages, including but not limited to lost income, reduced pension benefits, and legal fees.

112.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer emotional distress and loss of quality of life.

## SECOND CAUSE OF ACTION
### (National Origin Discrimination - New York State Claim Pursuant to the Executive Law Against all Defendants)

113.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-112 as set forth above.

114.    At all relevant times, Defendants were an "employer" within the meaning of Executive Law § 292(5).

115.    Plaintiff is an "employee" within the meaning of the Executive Law § 292(6).

116.    In violation of Executive Law § 296, et seq., Defendants discriminated against Plaintiff based on national origin by denying him promotions and promotional opportunities, and therefore giving him less pay and rank as compared to less qualified Lieutenants.

117.    Plaintiff has been subjected to Defendants' disparate treatment, in whole or in part, on the basis of his national origin, in violation of the Executive Law §296(1)(a), by treating him differently from and less favorably than similarly situated employees who were of non-Puerto Rican national origin, subjecting him to disparate terms and conditions that similarly situated, non-Puerto Rican/Hispanic and less qualified detectives did not endure.

118.    As a result of the Defendants' discriminatory conduct, Plaintiff has incurred and will continue to incur damages, including but not limited to lost income, reduced pension benefits, and legal fees.

119.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer emotional distress and loss of quality of life.

**THIRD CAUSE OF ACTION**
**(National Origin Discrimination – New York City Claim Pursuant to**
**the Administrative Code Against All Defendants)**

120.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-119 as set forth above.

121.    In violation of Administrative Code, §8-107, et seq., Defendants discriminated against Plaintiff based on national origin by denying him promotions and promotional opportunities, and therefore giving him less pay and rank as compared to less qualified Lieutenants.

122.    Plaintiff has been subjected to Defendants' disparate treatment, in whole or in part, on the basis of his national origin, in violation of the Administrative Code, §8-107, et seq., by treating him differently from and less favorably than similarly situated employees who were of non-Puerto Rican national origin, subjecting him to disparate terms and conditions that similarly situated, non-Puerto Rican/Hispanic individuals did not endure.

123.    As a result of the Defendants' discriminatory conduct, Plaintiff has incurred and will continue to incur damages, including but not limited to lost income, reduced pension benefits, and legal fees.

124.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer emotional distress and loss of quality of life

**FOURTH CAUSE OF ACTION**
**(Age Discrimination – New York State Claim Pursuant**
**to the Executive Law Against All Defendants)**

125.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-124 as set forth above.

126.    In violation of Executive Law § 296, et seq., Defendants discriminated against Plaintiff based on age by denying him promotions and promotional opportunities, and therefore giving him less pay and rank as compared to younger and less qualified Lieutenants.

127.    Plaintiff has been subjected to Defendants' disparate treatment, in whole or in part, on the basis of his age in violation of Executive Law § 296, et seq., by treating him differently from and less favorably than similarly situated employees who were younger and less qualified, by subjecting him to disparate terms and conditions that similarly situated, younger and less qualified detectives, did not endure.

128.    As a result of the Defendants' discriminatory conduct, Plaintiff has incurred and will continue to incur damages, including but not limited to lost income, reduced pension benefits, and legal fees.

129.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer emotional distress and loss of quality of life.

**FIFTH CAUSE OF ACTION**
**(Age Discrimination – New York City Claim pursuant**
**to the Administrative Code against all Defendants)**

130.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-129 as set forth above.

131.    In violation of Administrative Code, §8-107, et seq., Defendants discriminated against Plaintiff based on age by denying him promotions and promotional opportunities, and therefore giving him less pay and rank as compared to less qualified Lieutenants.

132.    Plaintiff has been subjected to Defendants' disparate treatment, in whole or in part, on the basis of his age in violation of Administrative Code, §8-107, et seq., by treating him differently from and less favorably than similarly situated employees who were younger and less

qualified, by subjecting him to disparate terms and conditions that similarly situated, younger and less qualified detectives, did not endure.

133.    As a result of the Defendants' discriminatory conduct, Plaintiff has incurred and will continue to incur damages, including but not limited to lost income, reduced pension benefits, and legal fees.

138.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer emotional distress and loss of quality of life.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants, jointly and severally, awarding Plaintiff compensation and other damages in the form of back pay, front pay, and other monies and benefits unlawfully denied to Plaintiff, as well as for emotional distress, permanent damages to Plaintiff's emotional/mental well-being, loss of enjoyment of life, including pain and suffering, shame and humiliation.

1.    On the First Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

2.    On the Second Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

3.    On the Third Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

4.      On the Fourth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

5.      On the Fifth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

6.      That Plaintiff have such other, further, and different relief as the Court deem just, proper, and equitable in the circumstances, together with interest on all Causes of Action, attorney's fees, and costs and disbursements in this action.

Dated: New York, New York
      October 23, 2018

                BALLON STOLL BADER & NADLER, P.C.

           By: _____s/Marshall B. Bellovin_____
                Marshall B. Bellovin, Esq. (MB5508)
                *Attorneys for Plaintiff*
                729 Seventh Avenue, 17th Floor
                New York, New York, 10019
                212-575-7900